**FILED**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

2010 FEB 22  AM 11: 06

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO. FLORIDA

**UNITED STATES OF AMERICA,**

**Plaintiff,**

v.

Case No. 6:10-cv- 292 - ORL- 19KRS

**$316,418.50 WITHDRAWN FROM**
**CHASE BANK ACCOUNT #942-322899-2**
**HELD IN THE NAME OF YEHODIZ**
**PADUA D/B/A ONLINE MARKETING**
**SOLUTIONS**

**Defendant.**

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff United States of America, by and through the undersigned Assistant

United States Attorney, brings this complaint and alleges upon information and belief, in

accordance with Supplemental Rule G(2), Supplemental Rules for Admiralty or

Maritime Claims and Asset Forfeiture Actions, as follows:

## NATURE OF THE ACTION

1.      This is a civil action *in rem* to forfeit to the United States, $316,418.50

Withdrawn from Chase Bank Account #942-322899-2 held in the name of Yehodiz

Padua d/b/a Online Marketing Solutions ("Defendant Funds"), pursuant to 18 U.S.C. §

981(a)(1)(C), as proceeds traceable to a conspiracy to commit a "specified unlawful

activity," as that term is defined in 18 U.S.C. § 1956(c)(7), specifically wire fraud

offenses.  The conspiracy to commit wire fraud offenses that gives rise to this action is

a Ponzi/Pyramid scheme operated by Alpha Trade Group (ATG), Jose Cecilio Martinez

Beltran (Martinez), Francisco Amaury Suero Matos (Suero), Yehodiz Padua Valentin

(Padua), and Welinton Bautista Castillo (Bautista) and others in which investors have been defrauded out of hundreds of thousands of dollars.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over an action commenced by the United States by virtue of 28 U.S.C. § 1345, and over an action for forfeiture by virtue of 28 U.S.C. § 1355.

3.      This Court has *in rem* jurisdiction over the defendant currency pursuant to:

a.      28 U.S.C. § 1355(b)(1)(A), because pertinent acts or omissions giving rise to the forfeiture occurred in the Middle District of Florida; and

b.      28 U.S.C. § 1355(b)(1)(B), because venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395.

4.      Venue is proper in the District Court for the Middle District of Florida, pursuant to 28 U.S.C. § 1355(b)(1), because the acts or omissions giving rise to the forfeiture occurred in this district.

## THE DEFENDANT *IN REM*

5.      The defendant property consists of $316,418.50 withdrawn from Chase Bank Account #942-322899-2 held in the name of Yehodiz Padua d/b/a Online Marketing Solutions that was deposited into the U.S. Customs & Border Protection Suspense Account on September 28, 2009.

6.      As set forth in Supplemental Rule G(3)(b)(i), the Clerk must issue a warrant to arrest the defendant property if it is in the government's custody.[1]

---

[1] In this regard, however, Supp'l Rule G is inconsistent with the current Local Admiralty Rule 7.03(b)(1), that requires a judicial officer to first review the verified

2

7.     The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), because they constitutes proceeds traceable to the conspiracy to commit a "specified unlawful activity," as that term is defined in 18 U.S.C. § 1956(c)(7).  A "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7), includes offenses listed in 18 U.S.C. § 1961(1).  Specifically, 18 U.S.C. § 1961(1) includes wire fraud violations.

## FACTS

8.     Specific details of the facts and circumstances supporting the forfeiture of the Defendant Funds are contained in the Affidavit of United States Department of Homeland Security, Immigration and Customs Enforcement (ICE) Special Agent Michael Rifenberg, which is attached hereto as Exhibit A and fully incorporated herein by reference.

9.     As required by Rule G(2)(f), the facts set forth in the attached affidavit support a reasonable belief that the government will be able to meet its burden of proof at trial.  Specifically, for the reasons set forth in the attached affidavit, there is probable cause to believe that the Defendant Properties constitute or are derived from proceeds traceable to a violations of 18 U.S.C. § 1343, and therefore, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, the United States requests that process, in accordance with the provisions of Supplemental Rule G, issue against the Defendant Funds to enforce the forfeiture and that any person or persons having an interest therein be cited and

---

complaint, and any other relevant case papers, prior to the Clerk issuing the warrant of arrest and/or summons *in rem*.

directed to appear and show cause why it should not be decreed; and that the

Defendant Funds be forfeited to the United States for disposition according to law; and

that the United States have such other and further relief as this case may require.

Respectfully submitted,

A. BRIAN ALBRITTON
United States Attorney

By: _____
Nicole M. Andrejko
Assistant United States Attorney
Florida Bar No. 0820601
501 West Church St., Suite 300
Orlando, FL 32805
Telephone: (407) 648-7500
Facsimile: (407) 648-7643
E-mail: Nicole.Andrejko@usdoj.gov

## VERIFICATION

I, Michael Rifenberg, hereby verify and declare under penalty of perjury as provided by 28 U.S.C. § 1746 that I am a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, that I have read the foregoing Verified Complaint *in rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true and correct to my own knowledge, except those matters herein stated to be alleged on information and belief and, as to those matters, I believe them to be true and correct.

The sources of my knowledge and information, and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case and other cases.

Executed this __19__ day of February, 2010.

Michael Rifenberg, Special Agent
Immigration and Customs Enforcement

5

## AFFIDAVIT

I, Michael Rifenberg, being duly sworn, depose and state as follows:

1.      I am a Special Agent (SA) of the United States Department of Homeland Security, Immigration and Customs Enforcement (ICE) assigned to the Orlando, Florida office and have been so employed since March 2007.  Among my duties as a SA, I am charged with the investigation of financial crimes, including wire fraud, mail fraud, unlicensed money transmitting businesses and money laundering.  I have been involved in several investigations involving Ponzi/Pyramid schemes[1] that resulted in the issuance of seizure warrants.  As a SA, I have conducted numerous wire fraud, money laundering and other financial crimes investigations.  I have conducted and participated in several investigations that have resulted in the seizures of criminally derived property, including, but not limited to monetary instruments.  I have become knowledgeable about the methods and means by which criminals use wire communications to facilitate various fraudulent schemes.

2.      The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from law enforcement officers, reviews of documents and computer records related to this investigation, communications with others who

---

[1]  Ponzi schemes promote allegedly lucrative business opportunities, often involving foreign currency exchange, precious metals trading, or other high return investments. However, in a Ponzi scheme, there is in fact no underlying profitable business to support the payments promoters say they will make to the investors.  Instead, the promoters simply use the money obtained from a growing base of latter investors to pay so-called "profits" to earlier investors.  Schemes that depend on growing the base of new investors to support payments to prior investors are also referred to as pyramids. The Internet is increasingly used as a vehicle to promote each of these types of frauds. Ponzi schemes have evolved with the development of the Internet, but their basic premise remains the same: later investors' funds are used to pay the earlier investors.

1

have personal knowledge of the events and circumstances described herein (including participants,) and information gained through my training and experience and the training and experience of others. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of the civil forfeiture complaint, it does not set forth each and every fact that I or others have learned during the course of the investigation.

3.      This affidavit is being submitted for the limited purpose of supporting the civil forfeiture complaint against the following:

**$316,418.50 Withdrawn from Chase Bank Account #942-322899-2
Held in the name of Yehodiz Padua d/b/a Online Marketing Solutions**

## I.      Overview of Scheme

4.      Jose Cecilio Martinez Beltran (Martinez), Francisco Amaury Suero Matos (Suero), Yehodiz Padua Valentin (Padua), and Welinton Bautista Castillo (Bautista) have been operating a Ponzi/Pyramid scheme by holding investment presentations in the state of Florida and worldwide via the Internet through Alpha Trade Group (ATG). According to Panamanian records, ATG was incorporated in Panama City, Panama on April 20, 2009. Its corporate officers were listed as follows: Padua – president; Bautista – treasurer; and Martinez – secretary.[2] Panamanian records do not indicate in what type of business ATG is involved or purported to be involved. Agents have found no information to suggest that ATG is incorporated anywhere in the United States. However, as described below, ATG appears to be using various corporations and

---

[2] During an interview with agents, Padua and Bautista provided agents with ATG's "Partnership Contract," signed by all parties involved, which listed its corporate officers as follows: Suero – president; Martinez – vice president; Padua – executive vice president; and Bautista – chief executive officer.

2

fictitious names registered in the state of Florida, including Orsa Investment Group, LLC and Online Marketing Solutions, to facilitate the transfer of wire fraud proceeds by moving investor funds into bank accounts controlled by the above-referenced individuals.

5. Since April 2009, the above-referenced individuals have been deceiving investors by making claims, both via the Internet and at business opportunity meetings,[3] that investments in ATG, as advertised on www.alphatradegroup.com, would yield exceptionally high returns not achievable anywhere in the legitimate business world. Specifically, ATG advertised on its website and at business opportunity meetings that investors could receive between 12.5% and 25.5% in returns on their investment per month. ATG additionally advertised on its website that investments were made in the FOREX market,[4] the trading of commodities and futures, and project funding. All of the investment programs ATG offered required investors to "lock in" their funds for one to six months. If investors chose to withdraw their funds prior to the investment program

---

[3] Such meetings were held at various public and private locations throughout the Central Florida area, including Panera Bread restaurants, Potato Plus restaurant located in Kissimmee, Florida, and an apartment unit located at or near 5969 Lee Vista Boulevard, Orlando, Florida, to solicit investors to invest money in ATG. These meetings included presentations by promoters of ATG, generally using information and materials, which were also available on ATG's website.

[4] The FOREX market is a subset of the larger foreign exchange market. A FOREX scam, as the one described in this affidavit, is any trading scheme used to defraud individual traders by convincing them that they can expect to gain a high profit by trading in the foreign exchange market. According to the New York Times, this "market has long been plagued by swindlers preying on the gullible." Jack Egan, *Check the Currency Risk*, N.Y. Times, June 19, 2005. The average individual foreign-exchange-trading victim loses about $15,000, according to CFTC records. Peter McKay, *Scammers Operating on Periphery Of CFTC's Domain Lure Little Guy With Fantastic Promises of Profits*, The Wall Street Journal, July 26, 2005.

ending, no yields were given and a 10% penalty was assessed. In typical Pyramid fashion, the more money investors invested with ATG, the higher the investment returns were offered. ATG investors were not specifically told where their money was being invested. Instead, ATG's website merely indicated that it "manage[d] members funds by placing those funds in a proprietary investment platform" for the investments described above and that "professional money managers" managed such investments.

6.     Typical of the Pyramid-type behavior, ATG also offered a referral program for investors who recruited other individuals to invest in ATG, called the "ATG International Referral Network." Recruiters or promoters would receive a 10% commission on their referrals' initial investments. Recruiters would also receive commissions for each investor their referrals subsequently recruited into ATG.

7.     As mentioned above, an examination of bank records relating to ATG, corporate documentation, statements made by officers of ATG, statements made by ATG investors and other investigative techniques have demonstrated that ATG was committing fraud by misrepresenting to investors that it was actually investing their money as described above. Instead, bank records indicate that Padua and Bautista were misappropriating investors' funds for their own personal benefit and were not investing the funds as advertised.

## II.     Relevant Corporations

8.     Investigators have been unable to locate domestic bank accounts held in ATG's name. Instead, at various times throughout the scheme, ATG's website and its promoters instructed members to send investment funds to various accounts in the name of various corporations and fictitious names, which were controlled by Martinez,

4

Suero, Padua, Bautista, and others.  Indeed, as recently as June 2009, ATG members were instructed to send funds to Chase Bank Account #942-322899-2 held in the name of Online Marketing Solutions.  The following is a list of the corporations utilized by ATG to operate this fraud:

9.      **Online Marketing Solutions (OMS)** registered in the state of Florida as a fictitious name on May 4, 2009 by Padua.  OMS' business address was listed as 7494 Ranchero Street, Orlando, Florida 32822.[5]  Martinez, Suero, Padua and Bautista were listed as owners.  On May 20, 2009, OMS' registration was cancelled by Padua.  On this same day, Padua re-registered OMS as a fictitious name, with only Martinez, Padua and Bautista listed as owners.  Agents were unable to locate any information which suggested that OMS operated business activity other than receiving investor funds on behalf of ATG.

10.     **Orsa Investment Group, LLC (Orsa)** was incorporated in the state of Florida on September 9, 2008.  Maria Gutierrez (M. Gutierrez) was listed as the registered agent and manager.  Martinez, Rosario Gutierrez (R. Gutierrez) and Maria Rodriguez (Rodriguez) were also listed as managers.  Orsa's business address was listed as 10222 Caroline Park Drive, Orlando, Florida 32832.[6]  According to Orsa's website, www.orsainvestmentgroup.com, which is no longer active, the company purported to provide its members with "customized income solutions."  While agents were unable to locate any affiliation with ATG on Orsa's website, accounts held by Orsa were utilized to accept ATG investor funds.  Agents were unable to locate any

---

[5]  This address is listed as Padua's residence on his Florida Driver's License.
[6]  M. Gutierrez is listed as the owner of this address.

information which suggested that Orsa operated business activity other than receiving

investor funds on behalf of ATG and various other investment-type groups, some of

which are suspected to be engaged in Ponzi/Pyramid schemes in the Middle District of

Florida.

### III.   ATG is Unlicensed to Operate Its Business

11.   Your affiant contacted the U.S. Commodity Futures Trading Commission

(CFTC) and conducted a search of the National Futures Association's (NFA) online

database in order to determine whether ATG, or any of its affiliates, hold any type of

investment licenses.  A check with both the CFTC and the NFA resulted in negative

results for any licenses or registration for ATG, OMS, Orsa, Martinez, Suero, Padua,

Bautista, M. Gutierrez, R. Gutierrez or Rodriguez.  According to the CFTC, ATG is

considered a "pool operator" because it collectively accumulates investor money for

various investments, including commodity investments.  Serving as a pool operator for

the purpose of purchasing commodities without a license or registration is in violation of

federal law.  Registration with the CFTC requires companies to produce disclosure

documents, yearly prospectuses and incorporation documents.  These are necessary to

protect investors from fraudulent practices by unregulated pool operators.

### IV.   Interview of Padua and Bautista

12.   On September 21, 2009, your affiant learned that Chase Bank Account

#942-322899-2 held in the name of Yehodiz Padua d/b/a Online Marketing Solutions

(OMG's Chase bank Account) was frozen by the bank due to suspicious account

activity.

13.     As a result of receiving this information, on September 22, 2009, your affiant interviewed Padua and Bautista.  Bautista indicated that he was a barber by trade.  Padua indicated he owned a flooring company called Rainbow Flooring, Inc. Bautista and Padua further indicated they met each other approximately one and a half years ago at Bautista's barbershop.  Prior to meeting each other, neither had any investment experience.  However, they soon learned that they shared a mutual interest in wanting to begin investing in the foreign exchange (FOREX) market, so they took a brief class on FOREX investing and began investing their own money in the FOREX market in late 2008.

14.     Padua and Bautista indicated that they met Suero in early 2009 through acquaintances involved in FOREX investing.  Because Suero lived in Mexico, the majority of their communications were made via telephone or video conferencing over the Internet.  Suero convinced Padua and Bautista to become partners with him in starting an investment business.  Suero also introduced Padua and Bautista to Martinez, who Suero claimed was an investment expert.  At that time, Martinez was already running Orsa, which offered alleged high-yielding investment programs, such as commodities trading and movie financing.

15.     In early 2009, Padua, Bautista, Martinez, and Suero agreed to form ATG, in order to offer high-yielding investment programs to the public.  Padua and Bautista indicated that the investment programs offered by ATG were devised by Martinez. Padua provided your affiant with the original ATG "Partnership Contract."  As stated above, the ATG Partnership Contract, which was signed on April 30, 2009, listed ATG's corporate officers as follows: Suero – president; Martinez – vice president; Padua –

7

executive vice president; and Bautista – chief executive officer. According to Padua and Bautista, ATG's website, www.alphatradegroup.com, was launched on or about May 20, 2009, by Suero.

16.    Padua and Bautista stated their primary role in the company was to act as promoters for ATG. They accomplished this by soliciting prospective investors, giving investment presentations at business opportunity meetings and, ultimately, convincing the prospective investors to join ATG. Padua and Bautista stated that they had several video conference meetings with Suero to discuss the various investment programs that they would be presenting to prospective investors in the Central Florida area. Padua and Bautista claimed they were under the belief that the investment programs they were promoting were legitimate and legal. However, Padua and Bautista admitted they knew very little of either the inner workings of the investments they were promoting or the inner workings of the company itself. They indicated that the only knowledge they had regarding the details of the investment programs ATG offered came from information that was provided to them by Suero and Martinez, who were very secretive regarding the details of the investments.

17.    According to Padua and Bautista, ATG also offered a referral program that compensated investors who recruited new investors to ATG. Investors who recruited new investors would receive a bonus equal to 10% of the new investor's monetary investment. As compensation for their role in ATG, Padua and Bautista indicated that

they were each paid payroll payments of $3,000.00 on approximately three occasions

throughout 2009.[7]

## V.    Other Bank Accounts Utilized by ATG Investors

### A.    Mercantile Bank Account #7600762334 Held in the Name of Yehodiz P. Valentin d/b/a Online Marketing Solutions

18.    Suero instructed Padua and Bautista to open a bank account in the name

of OMS, which would be used to collect money from ATG investors.  Accordingly, on

May 6, 2009, Padua opened Mercantile Bank Free Business Checking Account

#7600762334 held in the name of Yehodiz P. Valentin (Padua) d/b/a Online Marketing

Solutions (OMS' Mercantile Bank) with a $100.00 deposit at a branch located in

Orlando, FL.  Padua was the only signatory on the account.  Thereafter, on June 16,

2009 and June 17, 2009, this account received two wire transfers from ATG investors in

the amounts of $1,000.00 and $49,990.00, respectively.[8]  This account also received

two incoming wires totaling $14,280.00 on June 18 and 22, 2009, respectively.

However, both deposits were returned back to the senders.  On June 18, 2009,

Mercantile Bank closed the account due to possible fraudulent activity and issued

Padua Cashier's Check #687641 for the account balance, $51,050.00.[9]

### B.    Fifth Third Bank Account #7440859804 Held in the Name of Online Marketing Solutions

---

[7] Bank records from Bank of America Account #898029885780 held in the name of Orsa reveal that four checks were drawn on this account and made payable to Padua as follows: 1) July 13, 2009 - $3,000.00; 2) August 11, 2009 - $1,383.00; 3) August 11, 2009 - $3,000.00; and 4) September 16, 2009 - $3,000.00.  Bautista was issued one check from this account on August 11, 2009 in the amount of $3,000.00.
[8] According to Padua, the investors who deposited the funds were under the belief that their entire deposits were to be invested into an ATG investment program.
[9] The account balance included the $100.00 and a $40.00 deduction for wire transfer fees.

19.    On June 17, 2009, Padua and Bautista opened Fifth Third Bank Business

Basics Checking Account #7440859804 held in the name of Online Marketing Solutions

(OMS' Fifth Third bank Account) at branch in the Middle District of Florida.  Both Padua

and Bautista held signature authority on the accounts.  On June 22, 2009, Padua

deposited the $51,050.00 Cashier's Check #687641 derived from OMS' Mercantile

Bank Account into this account.  Padua indicated that the Cashier's Check from OMS'

Mercantile Bank Account was the only deposit of investor funds this account ever

received.  Padua further indicated that on June 29, 2009, he wired $43,000.00 to a

company called Advanced Forex Systems,[10] which was located in Anguilla.  Apparently,

Padua had grown tired of Martinez and Suero's secrecy regarding ATG investments, so

Padua and Bautista decided to invest the $43,000.00 with Advanced Forex Systems to

ensure that they were able to monitor the investment.[11]  Padua stated Advanced Forex

Systems was operated by Jorge Perez, who Padua and Bautista met through Martinez.

---

[10] Your affiant has conducted online research and has been unable to find any evidence
to corroborate the existence of a company called Advanced Forex Systems located in
Anguilla; however, bank records indicate "Advanced Forex Systems Ltd.," which was
located in Anguilla, was the beneficiary of a wire transfer in the amount $43,000.00 sent
from Fifth Third Bank account #7440859804 in the name of Online Marketing Solutions
on June 29, 2009.

[11] According to Padua and Bautista, in early 2009, Martinez told them about a new
investment program that allegedly offered a 100% rate of return and would begin paying
dividends after 60 days.  Martinez instructed Padua and Bautista to raise a total of
$500,000.00 in investor funds for the investment program, while he would raise another
$500,000.00 from investors, for a total of $1million.  Martinez told Padua and Bautista to
instruct new investors to wire funds to a Washington Mutual Bank Account held in the
name of Orsa.  Padua and Bautista stated they recruited a total of six investors, who
wired a total of approximately $300,000.00 to Orsa's Washington Mutual Bank Account.
Padua and Bautista indicated that they did not know how their investors' money was
being invested or where it was being sent after it was wired to the Orsa's Washington
Mutual Bank Account because Martinez had sole control of the account.  Padua and
Bautista became frustrated because they did not know what happened to that money.

Padua was under the belief that Advanced Forex Systems was a legitimate investment company. It was Padua and Bautista's intentions that in the event that Martinez failed to pay the six investors discussed in footnote ▓▓ their agreed upon profits and dividend payments, they planned on paying those investors with the profits they expected the $43,000.00 investment to generate, even though those funds belonged to other investors.[12] Padua and Bautista kept the remainder of the investor funds as compensation for themselves.[13]   On July 6, 2009, OMS' Fifth Third Bank Account was closed by the account holders.

## VI.     Tracing of Funds Sought for Seizure

20.     On May 18, 2009, prior to the Fifth Third Bank being opened, Padua opened Chase Bank (formerly Washington Mutual) Account #942-322899-2 held in the name of Yehodiz Padua d/b/a Online Marketing Solutions (OMS' Chase Account) with a $100.00 deposit at a branch in Orlando, FL. As discussed above, this investigation has revealed that ATG investors were directed to send their investment funds to several bank accounts, including this account. Padua was the only signatory on this account. However, Suero had the ability to withdraw funds from the account with a debit card.

21.     Padua indicated that through June 2009, OMS' Chase Account was credited with numerous deposits and incoming wire transfers from various individuals. However, at that point in time, Padua and Bautista had only given three ATG presentations to a handful of people, so Padua indicated he did not know where all the

---

[12] Padua acknowledged to your affiant that paying the initial six investors with funds derived from latter investors would not be fair to the latter investors.
[13] On June 26, 2009, Padua withdrew $7,000.00 from the account and on June 29, 2009, Bautista withdrew $1,600.00 from the account.

incoming wires were coming from. Padua indicated that he later learned from Suero that OMS' Chase Account was advertised on ATG's website. The ATG website instructed investors to wire funds to this account for investment. Padua was informed by Suero that Suero would withdraw money from the account as he needed for the investment programs. Padua believed the account was basically being used as an escrow account to facilitate the transfer of money from ATG investors to Suero.

22.     Bank records reveal that between May 18, 2009 and June 19, 2009, OMS' Chase Account received 45 credits[14] totaling $320,240.00. Aside from the initial $100.00 account opening deposit, it appears that this account was funded entirely from ATG investor funds. There were two checks drawn on the account, totaling $3,500.00, on June 3 and 18, 2009.[15] For reasons unknown to your affiant, there was no further activity in this account until the date it was closed by the bank on September 25, 2009.[16] Bank records do not indicate that funds from this account were ever used to invest as advertised to ATG investors. The account balance as of September 25, 2009 was $316,418.50.[17]

23.     On September 25, 2009, Chase Bank closed OMS' Account due to suspicions of fraudulent activity occurring within the account. Chase Bank issued Padua Cashier's Check #1167700502 in the amount of $316,418.50, which constituted

---

[14] The 45 credits were comprised of 26 wire transfers and 19 customer deposits. The 19 customer deposits consisted of checks, money orders and cash.

[15] Padua issued check #96 made payable to Jorge Perez in the amount of $2,500.00 on June 3, 2009. Padua also issued check #97 made payable to Fifth Third Bank in the amount $1,000.00 on June 18, 2009.

[16] Interestingly, the OMS Accounts at Fifth Third was opened and began accepting ATG investor funds around the time this account stopped receiving investor funds.

[17] A total of $321.50 was deducted from the account by the bank for wire transfer fees and service fees.

the entire contents of the account at the time of closure.  Padua agreed to cooperate

with law enforcement and agreed to turn the Cashier's Check over to ICE.  The

Cashier's Check was then seized by your affiant and Padua signed a "Notice of

Abandonment and Assent to Forfeiture" form.

## VII.    Investor Interviews

24.    On February 10, 2010, your affiant conducted a phone interview with a

Source of information (SOI) who invested with ATG.  The SOI indicated that she joined

ATG in May 2009 with an initial investment of $10,500.00 after an acquaintance referred

her to ATG's website.  The SOI indicated that she wired her funds to OMS' Chase

Account, which was advertised on ATG's website.  The SOI was never told where her

money was being invested, but she was able to monitor her account balance on ATG's

website.  The SOI indicated that after she registered with ATG, she was mailed a debit

card in order to withdraw available funds from her ATG account.  The SOI advised your

affiant that she successfully withdrew approximately $1,600.00 on two separate

occasions using her debit card during the summer of 2009.[18]  Since that time, however,

she has been unable to withdraw any additional funds from her account.  The SOI has

also not been able to reach anyone at ATG regarding her investment.

25.    On January 8, 2010, your affiant interviewed two other SOIs who made

joint investments with ATG.  The SOIs indicated that in approximately April 2009, they

attended a small ATG presentation given by Padua and Bautista in an apartment unit

located on Bent Pine Drive in Orlando, Florida.  At this meeting, Padua and Bautista

---

[18] As discussed above, bank records do not indicate that any money deposited into
OMS' Chase Account were ever used for investment purposes.

explained that ATG offered a variety of investment programs that invested in the

FOREX market, commodities trading, futures trading, and project funding. Padua and

Bautista instructed the SOIs to either wire transfer or deposit their money directly into

bank accounts in the name of OMS or Orsa. The SOIs indicated that bank account

information for investments, including the account numbers, were posted on ATG's

website. The SOIs stated they joined ATG in April 2009 with an initial investment of

$1,000.00, which they paid to Padua in cash. On May 12, 2009, the SOIs made a

second investment of $22,000.00, which they wired to Chase Bank Account #885-

024659-3 held in the name of Orsa. The SOIs stated their investment was supposed to

earn a 20% return per month for a total of 6 months. The SOIs stated they were mailed

a debit card, which was supposed to be used to withdraw funds from their ATG account

once the funds became available. The SOIs stated the card was never funded by ATG

and, therefore, they were never paid for either of their investments.

26.     Padua and Bautista explained to the SOIs that ATG members who

recruited new ATG investors would earn a commission equal to 10% of the new

investors' initial investment. Recruiters would also earn commissions on their recruits'

"downline"[19] of up to four "levels" or "generations." The SOIs stated they recruited

approximately 8 to10 people to join ATG throughout 2009. However, to the SOIs'

---

[19] In multi-level marketing and investment programs, a "downline" refers to the members
you have recruited or who have joined the program after you did and whose sales or
referrals also generate income for you. ATG offered recruiters commissions for up to
four levels of their "downline." For example, if Investor A recruited Investor B, Investor
A would receive a commission on Investor B's investment, which would be referred to
as level one. If Investor B then recruited Investor C, Investor A would also receive a
commission on Investor C's investment, which would be referred to as level two, and so
forth.

14

knowledge, none of the people they recruited into ATG have been paid any money from their investments. Moreover, the SOIs were never paid any of the commissions they were owed for recruiting new investors.

27.    Based on the information provided in this affidavit, I submit that there is probable cause to believe that ATG, and others, devised and intended to devise a scheme or artifice to defraud, or a scheme for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and that they transmitted or caused to be transmitted by means of wire, communications in interstate or foreign commerce, (including writings, signs, signals, pictures, or sounds) for the purpose of executing such scheme or artifice, to wit: an Internet-based Ponzi/Pyramid scheme, in violation of 18 U.S.C. §§ 1343 (Wire Fraud) and 371 (Conspiracy to Commit Wire Fraud). ATG and others orchestrated a scheme whereby ATG enticed investors to send funds to various accounts (including Online Marketing Solutions) controlled by the above-referenced individuals by promising exceptional returns on their investments, as well as the opportunity to earn commissions for recruiting new members to join ATG. This investigation has revealed that officers of ATG have misappropriated investor funds, by paying themselves with funds that were intended to be invested. Statements made by ATG officers also indicated that they intended to use funds derived from latter investors' investments to pay "profits" to early investors, which by definition, is a Ponzi scheme. Among the various bank accounts that were used to facilitate this scheme was Chase Bank account #942-322899-2 in the name of Yehodiz Padua dba Online Marketing Solutions. On September 25, 2009, Chase Bank closed this account and the entire contents of the account were converted into Chase Bank Cashier's Check

15

#1167700502 in the amount of $316,418.50.  These funds constitute proceeds of

violations of 18 U.S.C. §§ 1343 and 371, and are, therefore, subject to forfeiture

pursuant to 18 U.S.C. § 981(a)(1)(C).


_____
Special Agent Michael Rifenberg
U.S. Immigration and Customs Enforcement

State of Florida

County of Orange

        Before me, the undersigned authority personally appeared, Special Agent
Michael Rifenberg, who having produced his United States Immigration and Customs
Enforcement credentials as identification and having being duly sworn, deposes and
says that the foregoing Affidavit is true to the best of his knowledge, information and
belief.  Witness my hand and official seal in the State of Florida, County of Orange this
19th day of February, 2010.

STEPHANIE L. JACKSON
MY COMMISSION # DD 771217
EXPIRES: June 17, 2012
Bonded Thru Notary Public Underwriters

_____
Notary Public
Commission Expires:  6/17/2012

16